UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------- x
UNITED STATES OF AMERICA,                          :
                                                   :
                                    Plaintiff,     :        **MEMORANDUM &**
                                                   :        **ORDER DENYING**
                  -against-                        :        **DEFENDANT'S MOTION**
                                                   :        **TO SUPPRESS**
SEAN FALZARANO,                                    :
                                                   :        3:23-CR-00168 (VDO)
                                    Defendant.     :
----------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

       Defendant Sean Falzarano was indicted on five counts of Tampering with a Consumer

Product in violation of 18 U.S.C. § 1365(a)(4). Defendant now moves to suppress, pursuant to

the Fourth and Fifth Amendments and Fed. R. Crim. P. 12(b)(3)(C), his statements and all

items recovered from the search that occurred at Yale New Haven Hospital ("YNHH") on

January 31, 2022. The Court determined that Defendant's motion regarding the search

conducted raised a factual issue warranting an evidentiary hearing, which was held on June

27, 2024.

       After considering the parties' briefs, exhibits, and testimony at the evidentiary hearing,

and for the reasons discussed below, Defendant's motion to suppress is **DENIED**.

I.     <u>FACTUAL BACKGROUND</u>

       The following facts are adopted as findings of the Court. *See* Fed. R. Crim. P. 12(d)

("When factual issues are involved in deciding a [pretrial] motion, the court must state its

essential findings on the record.").

       Defendant was a registered nurse employed by YNHH and stationed in the Verdi 5

West unit at the Saint Raphael Campus. (Def. Mem., ECF No. 34-1, at 2; Def. Ex. B, ECF No.

36-1, at 2.) On January 31, 2022, YNHH had been investigating a report of a tampered vial of Lorazepam found in a Pyxis machine by Lauren Thorne, a nurse who worked in Defendant's unit, on January 30, 2022. (Def. Ex. B at 2; Def. Ex. C, ECF No. 36-2, at 4; Def. Ex. F, ECF No. 36-5, at 5.) A Pyxis machine is an automated medication dispensing system that requires an authorized user login, such as by fingerprint access, before controlled substances can be removed from them. (Def. Ex. F at 5.) A user may cancel or override a checkout and return the medication to the Pyxis machine without reporting that they removed medication from the machine. (*Id.*)

Upon receiving Thorne's report, YNHH staff examined the Pyxis machines in Verdi 5 West, which showed an unusually high number of override commands that were canceled by Defendant. (*Id.*; Def. Ex. B at 3; Def. Ex. C at 4.) At approximately 3:00PM on January 31, 2022, YNHH staff noticed that Defendant had logged into a Pyxis machine even though he was not working, or scheduled to be working, a shift at that time. (Def. Ex. A, ECF No. 34-2, at ¶ 2; Def. Ex. B at 2; Def. Ex. C at 4; Def. Ex. F at 5.) That morning, the Pyxis machines had been freshly stocked with new vials of Lorazepam; however, a reexamination of the machines after Defendant's login revealed that they now contained vials that appeared to have been tampered with and which were not the same vials stocked earlier in the day. (Def. Ex. B at 3; Def. Ex. C at 4.)

Thereafter, several YNHH staff members—including representatives from YNHH's Human Resources Department—attended a Zoom meeting to discuss Defendant as a suspect for the medication tampering. (Def. Mem. at 2; Def. Ex. B at 3; Def. Ex. C at 4; Def. Ex. D, ECF No. 36-3, at 2; Def. Ex. E, ECF No. 36-4, at 2.) Attendees included YNHH Protective Services Investigator John Inglese; Nick Proto, Head of YNHH Protective Services; Kathleen

Ferencz; Mariel Pereda; Paul Rochefort; Stacey Vaeth; Marissa Morehouse, Defendant's direct manager; Nigjar Polar; Emily Tiglio; and James Kennedy. (Def. Ex. C at 4.) During the meeting, a written statement was produced stating that YNHH believed Defendant had "something inappropriate on his person" and needed to be searched. (Def. Ex. B at 3.) While the Zoom meeting was still ongoing, Morehouse brought Defendant to her office, where Nurse Diversion Investigator Patty Brown and Lieutenant Dean Perkins from YNHH Protective Services were also waiting. (Def. Ex. A ¶ 3; Def. Ex. B at 3; Def. Ex. C at 4.) Morehouse read Defendant the written statement and later asked Defendant why he accessed the Pyxis machine if he was not working that day. (Def. Mem. at 2; Def. Ex. B at 3; Def. Ex. D at 2; Pl. Opp. at 3.) Defendant replied that he was assisting another nurse. (Def. Ex. D at 3; Pl. Opp. at 3.)

According to Defendant, he requested legal representation multiple times during this exchange, but he was assured that "he had representation with members of Human Resources (HR) present" via Zoom. (Def. Ex. D at 2; Def. Ex. A ¶ 5.) Defendant was requested to empty his pockets, which revealed syringes and flushes. (Def. Mem. at 3; Def. Ex. B at 3; Def. Ex. D at 2.) YNHH security informed Defendant that, due to the circumstances, they intended to search his locker and backpack as permitted by YNHH's employee handbook. (Def. Mem. at 3; Def. Ex. B at 3; Def. Ex. C at 4; Def. Ex. D at 3.) Defendant protested, stating that they could not search his backpack "for personal and privacy reasons." (Def. Ex. C at 4.)

Inglese and Morehouse escorted Defendant to his locker, the contents of which were emptied in a clear, plastic bag and brought to a conference room. (Def. Ex. A ¶ 8; Def. Ex. B at 3; Def. Ex. C at 4.) Subsequently, Defendant retrieved his backpack from a break room in the presence of Inglese and Morehouse. (Def. Ex A ¶ 11; Def. Ex. B at 3.) Defendant was taken into the conference room with Inglese, Morehouse, Brown, and Perkins present, where Inglese

searched his belongings, placing them on a table. (Def. Ex A ¶ 11; Def. Ex. B at 3; Def. Ex. C at 4; Def. Ex. D at 3.) The following items were seized from the backpack: two Diazepam injections, five Lorazepam 2mg vials, one Hydromorphone 2mg vial, six vials of sterile water, seven saline flushes, three syringes, sixteen safety glide needles, nineteen syringes, and a bag containing one metal crimper tool and numerous vial caps. (Def. Mem. at 4; Def. Ex. C at 4-5; Def. Ex. F at 5.) Brown took photos of these items. (Def. Ex. D at 3.) Defendant told the YNHH employees that he received a prescription of Lorazepam "under the table" to treat his anxiety because he could not have the medication on his medical record as a pilot. (Def. Ex. B at 3; Def. Ex. C at 5; Def. Ex. D at 3.)

Perkins testified that he informed Proto of the search, who told Perkins to call the New Haven Police Department ("NHPD"). NHPD Officer Joseph Perrotti testified that he and Officer Kyle Listro were dispatched at approximately 5:06PM and arrived at YNHH at 5:15PM. *See also* Pl. Hearing Ex. 5. When Listro and Perrotti reached Verdi 5 West, they assumed the investigation. (Def. Ex. B at 4.) Defendant and Brown left the conference room while NHPD searched and inventoried the evidence that was already searched by YNHH security. (Def. Ex. B at 3; Def. Ex. D at 3.) At some point, Defendant was read his *Miranda* rights and declined to speak to the NHPD. (Def. Ex. C at 5; Def. Ex. F at 6.) He was placed under custodial arrest for Illegal Obtaining of Drugs in violation of C.G.S. 21a-108, Illegal Possession of Controlled Substance in violation of C.G.S. 21a-279, and Larceny in the Sixth Degree in violation of 53a-125b. (*Id.*)

## II.    <u>LEGAL STANDARD</u>

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend.

IV. "To 'safeguard Fourth Amendment rights generally,' . . . the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights[.]'" *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (citing *Herring v. United States*, 555 U.S. 135, 139–40 (2009) and *Davis v. United States*, 564 U.S. 229, 239 (2011)). Because the exclusion of evidence "exacts a heavy toll on the justice system . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Herring*, 555 U.S. at 141).

On "a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980), *cert. denied*, 450 U.S. 917 (1981)).

The Fifth Amendment provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). The Supreme Court established in *Miranda v. Arizona* that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). In practice, *Miranda* requires that "prior to the initiation of [custodial] questioning, [law enforcement officers] must fully apprise the suspect of the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine,* 475 U.S. 412, 420 (1986) (fourth alteration in original) (quoting *Miranda*, 384 U.S. at 468–70).

On a motion to suppress statements made under the Fifth Amendment, the burden initially falls on the defendant to demonstrate that he was subject to custodial interrogation, and then shifts, once the defendant establishes a basis for his motion, to the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers. *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005); *United States v. Burger*, 739 F.2d 805, 809 (2d Cir. 1984).

## III.    DISCUSSION

Defendant contends that the YNHH security guards were state actors and consequently, their taking of statements and search of his property without a warrant violated the Fourth and Fifth Amendments. He also submits that the scope of the search conducted by the NHPD exceeded the scope by the YNHH security officers, and thus, the fruits of the NHPD's search should be suppressed. The Court addresses each of these arguments in turn.

### A.    The Fruits of YNHH Protective Services' Search and Defendant's Statements are not Suppressable Because YNHH Protective Services are not State Actors.

The activities of a purely private person in obtaining evidence—whether testimonial or physical—are not subject to the constitutional limitations on obtaining evidence, which include the requirement that *Miranda* warnings be given before custodial interrogation and that the

Fourth Amendment requirements for searches and seizures be satisfied. *See Burdeau v. McDowell*, 256 U.S. 465, 475–76 (1921); *United States v. Romero,* 897 F.2d 47, 52 (2d Cir. 1990) ("*Miranda* does not apply to incriminating statements made to private persons in the absence of police subterfuge or intimidation."); *United States v. Antonelli*, 434 F.2d 335, 337 (2d Cir.1970) ("[T]he Fifth Amendment privilege against self-incrimination does not require the giving of constitutional warnings by private citizens or security personnel employed thereby who take a suspect into custody. . . . A private security guard stands no differently from the private citizen who has employed him."); *United States v. Bennett*, 709 F.2d 803, 805 (2d Cir. 1983) ("[T]he surreptitious search of premises by a private party does not violate the Fourth Amendment."). If, however, a person operates "under color of law" or as an agent or instrument of the government, then such person may be considered to be a state actor subject to constitutional scrutiny. *United States v. Abney*, No. 03-CR-60 (JGK), 2003 WL 22047842, at *4 (S.D.N.Y. Aug. 29, 2003), *aff'd*, 109 F. App'x 472 (2d Cir. 2004).

The Supreme Court determined that "a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (internal citations omitted).

Defendant argues that YNHH's security officers qualify as state actors either under the "public function" or "joint action or close nexus" test.[1] The Court disagrees.

### 1.      YNHH Protective Services Do Not Perform a Public Function

Under the public function test, "state action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264–65 (2d Cir. 2014) (internal citation and quotation marks omitted). "'[V]ery few' functions fall into th[is] category." *Manhattan Cmty. Access Corp.*, 587 U.S. at 802 (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978)).

Defendant contends that YNHH Protective Services carry out a public function because they have plenary police powers such that they are *de facto* police officers. (Def. Mem. at 7.) In support of his argument, Defendant claims that the security officers "questioned [Defendant], detained him for extended periods of time, searched his belongings, and ultimately turned him over to the New Haven Police." (*Id.* at 8.) He further adds that because Proto and the Chief of Yale Police are both on a safety committee for Yale Medical School, and because Yale Medical School falls within the jurisdiction of Yale Police, "it suggests a relationship that underscores the protective services' public function as a police force." (*Id.* at 8–9.)

While it is undisputed that YNHH Protective Services searched Defendant's belongings and turned him over to the NHPD, there is no evidence in the record demonstrating that YNHH

---

[1] Because Defendant does not assert that YNHH Protective Services are state actors under the "compulsion" test, the Court does not conduct that analysis here.

security officers possess *plenary* police powers so as to have performed a "traditional, exclusive public function" reserved for law enforcement officers. Rather, Inglese testified that in his role as a YNHH Protective Services investigator, he (1) is not a sworn officer of the law, (2) does not have the authority to arrest anyone, (3) does not conduct criminal investigations, (4) does not wear a police uniform, (5) contacts the NHPD if there is a criminal investigation or activity, and (6) is employed only by YNHH. Moreover, while Lieutenant Perkins testified that he wears a YNHH security uniform (with a YNHH Protective Services badge) along with a utility belt containing a firearm and handcuffs, he cannot detain individuals if he is not aware of criminal activity and if he does put handcuffs on an individual, then the police must be called. Officer Perrotti further testified that YNHH does not have a holding cell in which individuals can be detained.

These facts—along with the fact that Defendant does not contend that: any of the security officers represented to him that they were police or law enforcement officers, he was arrested by YNHH Protective Services, they used any force or weapons, or that YNHH Protective Services restrained him using handcuffs or other restraints—leads the Court to conclude that YNHH Protective Services do not possess plenary police powers that are exclusively reserved for the State, and therefore, do not satisfy the "public function" test.[2] *See Josey v. Filene's, Inc.*, 187 F. Supp. 2d 9, 16 (D. Conn. 2002) (holding that private security guards were not state actors because they "did not have any special authority under state law to arrest the plaintiff . . . To constitute state action, there must be more than the fact that the

---

[2] The Court finds no merit to the argument that YNHH Protective Services serves a public function because one of its members sits on a committee at Yale Medical School.

security guards can call police for assistance."); *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 637–38 (6th Cir. 2005) (concluding that the power to detain trespassers and shoplifters, carry a firearm, and use a firearm in self-defense are not powers exclusively held by the state and that they, alone, do not make a private security guard a state actor); *cf. Payton v. Rush–Presbyterian*, 184 F.3d 623, 629 (7th Cir. 1999) (on-duty special police officers, licensed by the city of Chicago, enjoyed "virtually the same power as public police officers" and were thus state actors).

### 2. YNHH Protective Services Do Not Satisfy the Joint Action or Close Nexus Test

An entity may be a state actor if "there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). "The purpose of the close-nexus requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the [defendant] complains." *United States v. Stein*, 541 F.3d 130, 146–47 (2d Cir. 2008) (internal citation and quotation marks omitted). "A nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement*, either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is *entwined with governmental policies*." *Id.* at 147 (internal citation and quotation marks omitted).

Defendants maintains that there is an agency relationship between YNHH Protective Services and the NHPD because the NHPD participated in the search, assumed the investigation, and received all evidence obtained by YNHH security. (Def. Mem. at 10.)

The testimony presented by the parties indicates that there was no joint activity or coordination of action between YNHH and the NHPD. Inglese attested that he found and searched Defendant's belongings before the police were even contacted, and that no asked him to search Defendant's backpack on behalf of the NHPD. There were no law enforcement officers present on the Zoom call during which YNHH staff discussed the ongoing investigation, and it was not until Inglese spoke with Perkins that it was decided the NHPD was going to be called. In fact, Perkins testified that when Proto directed him to call the NHPD, he first contacted *Yale*'s dispatch, who then contacted the NHPD's dispatch. Most tellingly, Officer Perrotti testified that, when NHPD's dispatch first informed him of Defendant's alleged larceny, he did not know of anyone else who knew about the incident before he was dispatched, and it was not until Perrotti reached Verdi 5 West when he learned about YNHH Protective Services's investigation. Lastly, Perrotti talked with his supervisor, not with YNHH Protective Services, regarding whether Defendant should be arrested on the scene. Accordingly, it cannot be said that the actions taken by YNHH Protective Services demonstrate a "joint action" or "close nexus" between it and the NHPD. *See Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 171 (S.D.N.Y. 2006) (holding that store security officers who called police after detaining suspect until the police arrived were not state actors), *aff'd*, 232 F. App'x 26 (2d Cir. 2007).

Because the Court finds that YNHH Protective Services are not state actors,[3] the fruits of YNHH's search and any statements made by Defendant to YNHH security officers shall not be suppressed. *See Antonelli*, 434 F.2d at 337–38 ("[S]ince appellant's statements were made to persons not law enforcement officers or their agents, there was no police or 'custodial interrogation' within the meaning of Miranda, and [] no warnings need have been given. . . . [W]here this is no 'poisonous tree' there can be no 'fruit.'").

**B.    The Fruits of NHPD's Search are Not Suppressable Because the NHPD Did Not Exceed the Scope of YNHH Protective Services' Search.**

Defendant next argues that the scope of NHPD's search exceeded that of YNHH's and thus violated the Fourth Amendment because "it is not clear what component of the search was conducted by YNHH security, and what component was conducted by the New Haven Police Department." (Def. Mem. at 12.)

As a preliminary matter, the Court recognizes that the initial search by YNHH Protective Services was a private action and thus did not violate the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "The *additional* invasions of

---

[3] The Court notes that numerous courts in this District have held the same. *See McArthur v. Yale New Haven Hosp.*, No. 3:20-CV-998 (SRU), 2021 WL 3725996, at *8–9 (D. Conn. Aug. 23, 2021) (YNHH Protective Services' security check of Plaintiff did not give rise to section 1983 claim because "YNHH is not a state actor, and it did not act under the color of state law . . . There is no reason to believe that the state compelled YNHH to act, that there was a close nexus between the state and YNHH in this case, or that the state delegated YNHH a public function."); *Febres v. Yale New Haven Hosp.*, No. 19-CV-1195 (KAD), 2019 WL 7050076, at *3 (D. Conn. Dec. 23, 2019) (dismissing Section 1983 claim absent "any allegations which would transform Yale New Haven Hospital, a private entity, into a 'state actor'"); *Davis v. Yale New Haven Hosp.*, No. 3:16-CV-01578 (VLB), 2017 WL 6459499, at *5 (D. Conn. Dec. 11, 2017) (dismissing action because Plaintiff failed to allege that "Defendants were acting under color of state law when they interacted with Plaintiffs"); *Edwards v. Baptiste*, No. 3:06-CV-00952 (PCD), 2006 WL 3618021, at *2–3 (D. Conn. Dec. 11, 2006) (granting motion to dismiss because Plaintiff failed to demonstrate YNHH doctor was a state actor under the compulsion, close nexus/joint action, or public function tests).

[Defendant's] privacy by [a] government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115 (emphasis added). "If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy. Even though some circumstances—for example, if the results of the private search are in plain view when materials are turned over to the Government—may justify the Government's reexamination of the materials, surely the Government may not exceed the scope of the private search unless it has the right to make an independent search." *Walter v. United States*, 447 U.S. 649, 657 (1980).

It is evident from the evidence and testimony that the NHPD did not exceed the scope of YNHH's search as their "search" simply constituted a "reexamination of the materials." Defendant was requested to empty his pockets, which produced syringes and flushes, in front of YNHH Protective Services. (Def. Mem. at 3; Def. Ex. B at 3; Def. Ex. D at 2.) Both Morehouse and Inglese reported that they accompanied Defendant to his locker, Defendant opened his locker, and the contents were put into a patient belongings bag. (Def. Ex. A ¶ 8; Def. Ex. B at 3; Def. Ex. C at 4.) Then, Morehouse and Inglese accompanied Defendant to another room in which his backpack was located. (Def. Ex. B at 3; Def. Ex. C at 4.) Defendant retrieved the backpack and brought it to a conference room, where Inglese searched the backpack with Morehouse, Brown, and Perkins present. (*Id.*; *see also* Def. Ex. D at 3.) The following items were retrieved from the backpack by Inglese: two Diazepam injections, five Lorazepam 2mg vials, one Hydromorphone 2mg vial, six vials of sterile water, seven saline flushes, three syringes, sixteen safety glide needles, nineteen syringes, and a bag containing

one metal crimper tool and numerous vial caps. (Def. Mem. at 4; Def. Ex. C at 4-5; Def. Ex. F at 5.) Brown represents that she was the one who took photos of these items. (Def. Ex. D at 3.)

The representation that Brown took the pictures of the items (that were not taken by the NHPD's bodycam) is consistent with the timeline of the NHPD's arrival to YNHH and the timestamps on the photos. As previously discussed, Officer Perrotti testified that he and Officer Listro were dispatched at approximately 5:06PM and arrived at YNHH at 5:15PM. *See also* Pl. Hearing Ex. 5. At least four of Defendant's photo exhibits were taken *before* the NHPD's arrival and demonstrate that YNHH Protective Services searched Defendant's backpack, as they also found and searched the black pouch/bag found within the backpack.[4] *See* Def. Ex. L, ECF No. 36-7, at 2 (photo timestamped 4:54PM showing vials found in Defendant's possession); Def. Ex. M, ECF No. 36-7, at 4 (same); Def. Ex. N, ECF No. 36-7, at 6 (photo timestamped 5:05PM depicting Inglese searching black pouch and vials and needles on table); Def. Ex. O, ECF No. 36-7, at 8 (photo timestamped 5:05PM showing open black pouch). A photo taken after the police's arrival also confirms that Brown took the non-bodycam photos, as Officers Listro and Perrotti are in the photo themselves. *See* Def. Ex. V, ECF No. 36-7, at 22 (showing Listro and Perrotti standing near Defendant's backpack).

The photo evidence makes clear that Defendant's belongings were searched prior to the NHPD's arrival, and there is nothing in the record indicating that NHPD searched and found anything more than what was already searched and found in the backpack or on Defendant's person. *See, e.g.*, Def. Ex. F at 5–6 (stating that "[t]he search of [Defendant's] backpack

---

[4] Defendant asserts that "[i]t is unclear if the pouch was completely searched prior to law enforcement arriving." (Def. Mem. at 13.)

occurred prior to police arrival" and that the "described items located in [Defendant's] backpack were seized"); Def. Ex. G, ECF No. 36-6, at 2 (bodycam screenshot of opened backpack); Def. Ex. H, ECF No. 36-6, at 4 (bodycam screenshot of search of Defendant's pockets); Def. Ex. I, ECF No. 36-6, at 6 (same); Def. Ex. J, ECF No. 36-6, at 8 (bodycam screenshot of opened backpack); Def. Ex. K, ECF No. 36-6, at 10 (depicting officer looking at black pouch). What is more, Perrotti testified that Inglese showed him everything that was found, that he and Listro only searched the property after it was shown to them, and that they did an inventory of what was already put out on the table by Inglese.

Accordingly, because there was no "additional invasion" of Defendant's privacy, the fruits of YNHH's search are not suppressable. *See Jacobsen*, 466 U.S. at 109 ("Respondents could have no privacy interest in the contents of the package, since it remained unsealed and since the Federal Express employees had just examined the package and had, of their own accord, invited the federal agent to their offices for the express purpose of viewing its contents. The agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment."); *United States v. Tennant*, 5:23-CR-79 (BKS), 2023 WL 6978405, at *13 (N.D.N.Y. Oct. 10, 2023) (holding that because private entity had already viewed contents of images and videos, "any reasonable expectation of privacy had been extinguished, and [the Government's] viewing the images and videos again did not exceed the scope of the [] private searches").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to suppress (ECF No. 34) is **DENIED**. The Scheduling Order for trial entered at ECF No. 29 stands.

**SO ORDERED.**

Hartford, Connecticut
July 15, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge